FILED
2005 Mar-10  AM 10:16
U.S. DISTRICT COURT
N.D. OF ALABAMA


# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| LALIKANT K. MODI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-04-S-1135-NE |
| | ) | |
| JEREMY BLACKBURN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This action is before the court on motions filed by fewer than all defendants,[1] asking the court to dismiss plaintiff's claims for lack of personal jurisdiction[2] or, in the alternative, to transfer this case to the United States District Court for the District of South Carolina, Charleston Division.[3]

---

[1] The following defendants moved to dismiss plaintiff's claims for lack of personal jurisdiction on December 14, 2004: Harry Brossman; Mark Fried; Lloyd Hall; Stewarts Way, LLC; Brossman & Associates, LLC; and JJ Hall, LLC (doc. no. 13). That same day, defendant Indigo Creek Holdings, Inc., moved to dismiss plaintiff's claims for lack of personal jurisdiction or, in the alternative, to transfer this case to the District of South Carolina (doc. no. 14). These defendants submitted a unified brief in support of their motions on January 6, 2005 (doc. no. 17). The remaining, non-moving defendants are Jeremy Blackburn, Mayako Blackburn, Gregory McClelland, Jean Rene McClelland, and RNM, LLC.

[2] This aspect of the subject motions is based upon Federal Rule of Civil Procedure 12(b)(2), providing that: "Every defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion . . . (2) lack of jurisdiction over the person . . . ."

[3] This aspect of the motions is based upon 28 U.S.C. § 1404(a), which provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

## I. FACTUAL BACKGROUND

Defendant Indigo Creek Holdings, Inc. ("Indigo Creek"), was incorporated in the State of Nevada in February of 2003, and its principal place of business is Murrells Inlet, South Carolina.[4]   Indigo Creek is engaged in the business of selling workers compensation insurance coverage.[5]   Defendants Lloyd Hall, Mark Fried, Harry Brossman, Gregory McClelland, and Jeremy Blackburn are the five members of the company's Board of Directors.  Fried resides in Pennsylvania, Brossman in New Jersey, and the remaining directors are residents of South Carolina.[6]   These five, individual defendants also are "Managers" or "Managing Members" of four business entities named as defendants:  *i.e.*, Gregory McClelland and Jeremy Blackburn are Managers of "RNM, LLC," a Nevada limited liability company with its principal place of business in South Carolina; Harry Brossman is the Managing Member of "Brossman & Associates, LLC," a Nevada limited liability company with its principal place of business in New Jersey; Mark Fried is Managing Member of "Stewarts Way, LLC," a Nevada limited liability company with its principal place of business in Pennsylvania; and, Lloyd Hall is Managing Member of "JJ Hall, LLC," a Nevada

---

[4] *See* doc. no. 20 (Modi Affidavit), Ex. 10(A) (Articles of Incorporation) and *id.*, Ex. 10(B) (Bylaws).

[5] *Id.*, Ex. 10(I) at "I-7."

[6] *See id.*, Ex. 10(A) (Articles of Incorporation) at 2 and doc. no. 17 (Brief), appended Fried affidavit, ¶ 41.

limited liability company with its principal place of business in South Carolina.[7]  Prior to April 30, 2003, these four entities were the sole shareholders of Indigo Creek's common stock.  RNM owned forty percent of Indigo's shares, and JJ Hall, Stewarts Way, and Brossman and Associates owned twenty percent each.[8]

Indigo Creek issued a "Private Placement Memorandum" on March 23, 2003 ("the Memorandum"), in an attempt to raise capital.  The Memorandum explained to potential investors that Indigo Creek would sell "preferred" stock in the company for $50,000 a share.  Generally, holders of preferred stock would share in the "financial equity of the Company," but would be denied full voting privileges.[9]  The Memorandum included Indigo Creek's Articles of Incorporation, By-Laws, and a sample purchase agreement.[10]

Indigo Creek targeted the Memorandum to potential investors nationwide, including some persons in the State of Alabama.  One provision of the Memorandum pertained solely to Alabama residents, and read as follows:

### FOR ALABAMA RESIDENTS ONLY

These securities are offered pursuant to a claim of exemption under the Alabama Securities Act.  A registration statement relating to these securities <u>has not been filed</u> with the Alabama Securities

---

[7] Doc. no. 20 (Modi Affidavit), Ex. 9 (Agreement) and doc. no. 1 (Complaint).

[8] *See* doc. no. 20 (Modi Affidavit), Ex. 9 (Agreement) at 7.

[9] *See id.*, Ex. 10 (Private Placement Memorandum) at 19-20.

[10] *See id.*, Exs. 10(A)-(I).

Commission.  The Commission <u>does not</u> recommend or endorse the purchase of any securities, <u>nor does it pass upon</u> the accuracy or completeness of this Private Placement Memorandum.    Any representation to the contrary is a criminal offense.[11]

## A.    Contacts With Plaintiff

Plaintiff resides in Decatur, Alabama, but owns and operates a business in Cullman, Alabama.[12] Sometime before April 2, 2003, plaintiff received an unsolicited telephone call from defendant Lloyd Hall, one of Indigo Creek's five Board members.[13] Hall asked plaintiff whether he might be interested in "currency trading," but plaintiff declined.[14]   Shortly thereafter, plaintiff received a telephone call from defendant Gregory McClelland, another Board member.   During the course of this conversation, plaintiff agreed to meet with members of Indigo Creek's Board of Directors.[15]   Plaintiff later recounted the following events:

> On April 2, 2003, I met with Defendants Jeremy Blackburn ("Blackburn") and Gregory D. McClelland ("McClelland"), in Cullman, Alabama, at Defendants' request . . . . At that time, McClelland and Blackburn represented to me that they were officers and directors of, and represented and were acting on behalf of, Indigo Creek Holdings, Inc. (the "Company") and indicated that they were acting on behalf of and with knowledge of the other officers and directors.  They identified the other officers and directors of the Company.  They stated that they were

---

[11] Doc. no. 20 (Modi Affidavit), Ex. 10 (Private Placement Memorandum) at iv-v (emphasis in original).

[12] Doc. no. 20 (Modi Affidavit), ¶¶ 3 and 8.

[13] *Id.*, ¶ 8 at 3-4.

[14] *Id.*

[15] *Id.*

attempting to raise money for and on behalf of the Company through a
stock offering. McClelland and Blackburn offered to sell me twenty (20)
shares of preferred stock of the Company for the sum of One Million
Dollars ($1,000,000). Defendants represented to me through Blackburn
and McClelland that the money was to be used as capital by the
Company to enable it to immediately begin selling life insurance policies
in the worker's compensation area.[16]

Plaintiff was given a copy of the Private Placement Memorandum during this meeting.

Jeremy Blackburn transmitted an e-mail to plaintiff on April 23, 2003, three

weeks after their meeting. The message stated:

One thing you may not be aware of is that we are not willing to become
partners with someone we don't like on a personal level. We feel we can
have a successful business relationship with you but also a successful
personal relationship as well. We like to do business with people we can
trust and get along with. We feel you are that type of person.[17]

Blackburn transmitted another e-mail to plaintiff on April 23, 2003, continuing their

negotiations.[18] Plaintiff expressed some reservations about investing in Indigo Creek,

and Blackburn responded: "Mike [plaintiff], I know of no business that is risk free."[19]

The parties ultimately reached an agreement on April 30, 2003, with significant

concessions made in favor of plaintiff. Plaintiff executed three separate contracts on

that date. He first executed an "Agreement" with defendants Indigo Creek, Brossman

& Associates LLC, JJ Hall LLC, RNM LLC, and Stewarts Way LLC: *i.e.*, the

---

[16] Doc. no. 20 (Modi Affidavit), ¶ 8 at 4.

[17] *Id.*, Ex. 4.

[18] *Id.*, Ex. 5 (August 23, 2003 1:20 PM e-mail).

[19] *Id.*

company and its four shareholders.[20]   The Agreement stated that plaintiff "is
considering an investment in the preferred stock of [Indigo Creek], but is willing to
do so only if the Shareholders and [Indigo Creek] agree to certain things set forth in
this Agreement."[21]   Among other matters, the shareholders agreed to vote their
common stock "in a manner that will permit [plaintiff] to serve as a member of the
Board of Directors of the Corporation."[22]

Plaintiff also entered into a separate "Agreement" (which the court will refer
to as the "Put Agreement") with Board members Gregory McCllelland and Jeremy
Blackburn, and their respective spouses Jean Rene McClelland and Mayako
Blackburn,[23] who also are named as defendants to this action.  The Put Agreement
stated that "[t]his Agreement is made in contemplation of [plaintiff's] purchase of
twenty (20) shares of preferred stock in Indigo Creek Holdings, Inc., . . . for the sum
of One Million and 00/100's Dollars ($1,000,000.00) and shall be effective only in the
event of such purchase."[24]   The Put Agreement gave plaintiff an option to sell his
shares of preferred stock to Mayako and Jeremy Blackburn, and Jean Rene and
Gregory McClelland, as early as April 30, 2004.[25]

---

[20] *Id.*, Ex. 9 (Agreement).

[21] *Id.*

[22] *See id.* at § 2.01.

[23] Doc. no. 20 (Modi Affidavit), Ex. 2 ("Agreement").

[24] *Id.*

[25] *Id.*

Finally, plaintiff executed a "Subscription and Suitability Agreement" with Indigo Creek, by the terms of which he agreed to purchase twenty shares of preferred stock in Indigo Creek for a sum of $1,000,000.  Plaintiff transferred that sum to Indigo Creek the same day.[26]

Jeremy Blackburn sent two e-mails to plaintiff during May of 2003.  In a May 9, 2003 e-mail, Blackburn said "Mark Fried and I have been out in Utah this week. We have met with several potential clients and did receive one new submission . . . . You have really kick started things.  Lloyd, Greg, and Harry all had good weeks as well in getting submissions from clients on the East coast."[27]

Plaintiff was far less than satisfied, however.  He claims that defendants refused to issue his stock certificates, refused to give him access to the company's financial records, failed to give him sufficient notice of shareholder meetings, and denied him the opportunity to elect members of the Board of Directors.[28]

## B.   Plaintiff's Suit and Failed Settlement

As a consequence, plaintiff filed suit on June 2, 2004.[29]  The case was originally assigned to Judge Sharon L. Blackburn, but reassigned to this court on June 23,

---

[26] Doc. no. 20 (Modi Affidavit), ¶¶ 22-23.

[27] *Id.*, Ex. 7; *see also id.*, Ex. 8 (May 23, 2003 e-mail).

[28] *See* doc. no. 20 (Modi Affidavit), ¶¶ 24, 38, 39.

[29] Doc. no. 1.

2004.[30]  Plaintiff's complaint included fifteen counts, alleging violations of federal law, Alabama law, and Nevada law.[31]  Generally, plaintiff claimed that defendants fraudulently induced his stock purchase, that he was denied the benefits he had bargained for, and that the Blackburns and McClellands breached the terms of the Put Agreement when he sought to recover his investment.  Defendants did not answer plaintiff's complaint.  Instead, they attempted to negotiate a settlement, as explained in one of plaintiff's briefs to the court:

> Following the initiation of this action on June 2, 2004, the Defendants approached [plaintiff] in an effort to settle the case.  This contact resulted in the execution of a settlement agreement (the "Agreement") on July 19, 2004[,] which outlined a payment schedule to repay [plaintiff's] $1,000,000 investment in the Company and compensate him for other damages, costs, expenses[,] and interest.  Every defendant in this action, except Gregory D. McClelland and Jean Rene[] McClelland, executed this Agreement.[32]

---

[30] Doc. no. 12.

[31] The counts may be summarized as follows:  (1) defendants committed "fraud and deceit" as defined under Alabama law, (2) defendants committed "fraudulent suppression of material facts"; (3) defendants omitted material facts from the Private Placement Memorandum, in violation of federal law; (4) defendants' "false and fraudulent conduct" violated Alabama law; (5) defendants wantonly and willfully caused injuries to plaintiff; (6) defendants breached their fiduciary duties to plaintiff; (7) plaintiff is entitled to rescission of the Subscription and Suitability Agreement; (8) defendants Jean Rene and Gregory McClelland, and Mayako and Jeremy Blackburn, breached the Put Agreement; (9) the "false and fraudulent conduct" of defendants violated Nevada law; (10) defendants' refusal to deny plaintiff access to Indigo Creek's business records violated Nevada law; (11) defendants engaged in "shareholder oppression"; (12) defendants breached "their duty to act in good faith toward Plaintiff"; (13) defendants and Board members McClelland, Blackburn, and Hall were not licensed  as "sales representatives of the issuer" as required under Nevada law; (14) defendants conspired to injure plaintiff; and (15) a constructive trust should be imposed over defendants' assets.  (*See* doc. no. 1.)

[32] Doc. no. 19 (Plaintiff's Brief) at 22.

8

The settlement agreement included the following provision:

> 16.    <u>Forum Selection and Choice of Law</u>
>
> The parties acknowledge that jurisdiction and venue for enforcement of, or any dispute arising out of, this Agreement, or any other dispute arising out of, or related to, any other agreement or dispute between the parties is hereby agreed to be in a court of competent jurisdiction in Madison County, Alabama, and that the substantive law which shall be applied shall be that of the State of Alabama without reference to the conflict of laws provisions of Alabama law.[33]

Plaintiff filed a sealed copy of the settlement agreement with the court on January 14, 2005, as part of his evidentiary submission in opposition to defendants' motions to dismiss, or to transfer.[34]   The parties did not inform this court of the settlement prior to that date.

## II.  DISCUSSION

### A.    Personal Jurisdiction

Federal district courts are tribunals of limited jurisdiction, "'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution,' and which have been entrusted to them by a jurisdictional grant authorized by Congress."   *University of South Alabama v. The American Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)).   Accordingly, an "Article III court must be sure of its

---

[33] *Id.* at 22-23.

[34] Doc. no. 20 (Modi Affidavit), Ex. 1.

own jurisdiction before getting to the merits" of any action.  *Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 831 (1999) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 88-89 (1998)).

When ruling upon a defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction in the absence of an evidentiary hearing, "the plaintiff must establish a *prima facie* case of personal jurisdiction over a nonresident defendant.  A *prima facie* case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 255 (11th Cir. 1996) (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (other citations omitted)); *see also, e.g., Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).  "The court, in considering the motion, must take all allegations of the complaint that the defendant does not contest as true, and, where the parties' affidavits conflict, the court must construe all reasonable inferences in favor of the plaintiff." *South Alabama Pigs, LLC v. Farmer Feeders, Inc.*, 305 F. Supp. 2d 1252, 1257 (M.D. Ala. 2004).

The determination of personal jurisdiction over nonresident defendants is a two-step, analytical process.  First, the court must address the reach of the forum state's long-arm statute.  Second, "[i]f there is a basis for the assertion of personal jurisdiction under the state statute, [the district court must] next determine whether

sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment." *Robinson*, 74 F.3d at 256 (citations omitted) (quoting *International Shoe Co. v. Washington*, 326 U.S. 316 (1945)).

Alabama's long-arm statutes, which are encapsulated in Alabama Rule of Civil Procedure 4.2(a), "permits its courts to exercise jurisdiction over nonresidents to the fullest extent allowed under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Ruiz de Molina v. Merritt & Furman Insurance Agency, Inc.*, 207 F.3d 1351, 1355-56 (11th Cir. 2000) (citing Ala. R. Civ. P. 4.2(a)(2)(I));[35] *see also Martin v. Robbins*, 628 So. 2d 614, 617 (Ala. 1993); *Horn v. Effort Shipping Co., Ltd.*, 777 F. Supp. 927, 929 (S.D. Ala. 1991). A plaintiff filing suit in Alabama may, therefore, establish the court's jurisdiction over nonresident defendants by demonstrating that federal due process requirements are satisfied. *See South Alabama*

---

[35] Rule 4.2(a)(2)(I) of Alabama Rules of Civil Procedure provides, in pertinent part:

(2) Sufficient Contacts. A person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person's:

. . .

(I) otherwise having some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action. The minimum contacts referred to in this subdivision (I) shall be deemed sufficient, notwithstanding a failure to satisfy the requirement of subdivisions (A)-(H) of this subsection (2), *so long as the prosecution of the action against a person in this state is not inconsistent with the constitution of this state or the Constitution of the United States.* [Emphasis supplied.]

*Pigs*, 305 F. Supp. 2d at 1257 ("Due process requires that the defendant have had 'minimum contacts' with the forum State, *and* that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'") (emphasis supplied) (quoting *Burnham v. Superior Court of California*, 495 U.S. 604, 618 (1990) (in turn quoting *International Shoe*, 326 U.S. at 316)).

### 1.     Indigo Creek Holdings, Inc.

Indigo Creek's Private Placement Memorandum offered to sell preferred shares of corporate stock to Alabama residents pursuant to "a claim of exemption" under the Alabama Securities Act.[36]  Indigo Creek then targeted plaintiff, a resident of the State of Alabama, as a potential buyer.  The company sent two members of its Board of Directors to visit plaintiff in Alabama.  These individuals admitted to plaintiff that they were acting on behalf of Indigo Creek.[37]   One of those Board members

---

[36] The purpose of the Alabama Securities Act is to "protect the public from fraudulent, dishonest, or unethical practices in the securities business." *Securities America, Inc. v. Rogers*, 850 So. 2d 1252, 1257 (Ala. 2003) (citing Comment to § 8-6-3, Ala. Code 1975).  The Act therefore requires "every person engaged in the business of effecting transactions in securities in Alabama to be registered with the Alabama Securities Commission." *Securities America*, 850 So. 2d at 1257 (citing § 8-6-3, Ala. Code 1975).  A person may claim exemption from that registration requirement, however, if he or she is engaging in one of the transactions enumerated in § 8-6-11, Ala. Code 1975.  The court may reasonably infer that defendant availed itself of one of these exceptions.  As defendant stated in its Private Placement Memorandum, "[a] registration statement relating to these securities has not been filed with the Alabama Securities Commission." (Doc. no. 20, Modi Affidavit, Ex. 10 at iv (underline in original)).

[37] *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 102 n.7 (where the allegations support an inference of a principal-agent relationship, activities of a party's agent may count toward the minimum contacts necessary to support jurisdiction).

12

transmitted five e-mails[38] to plaintiff to urge and negotiate his stock purchase.  Indigo Creek then sold twenty shares to plaintiff for one million dollars.

The court finds that Indigo Creek had "minimum contacts" with the State of Alabama, and that the exercise of jurisdiction over defendant would not offend "traditional notions of fair play and substantial justice."  In addition, the court may exercise jurisdiction over Indigo Creek under an alternate theory.

### a.        The settlement agreement's forum selection clause

Indigo Creek entered into a settlement agreement with plaintiff on July 19, 2004, less than two months after plaintiff initiated this action.  The settlement agreement included a Forum Selection Clause which provided as follows:

> The parties acknowledge that jurisdiction and venue for enforcement of, or any dispute arising out of, this Agreement, or any other dispute arising out of, or related to, any other agreement or dispute between the parties is hereby agreed to be in a court of competent jurisdiction in Madison County, Alabama.[39]

"Forum selection clauses in contracts are enforceable in federal courts."  *P&S Business Machines, Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003) (citing *M/S Bremen v. Zapata Off-Shore Company*, 407 U.S. 1, 15 (1972)).  The

---

[38] *See Reliance National Indemnity Corporation v. Pinnacle Casualty Assurance Corporation*, 160 F. Supp. 2d 1327, 1333 (M.D. Ala. 2001) ("E-mails, like letters and phone calls, can constitute minimum contacts, at least if the defendant or his agents send the message for pecuniary gain rather than substantially personal purposes.").

[39] Doc. no. 19 (Plaintiff's Brief) at 22.

Supreme Court has noted that,

> because the personal jurisdiction requirement is a waivable right, there
> are a "variety of legal arrangements" by which a litigant may give
> "express or implied consent to the personal jurisdiction of the court."
> *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, [456
> U.S. 694, 703 (1982)].   For example, particularly in the commercial
> context, parties frequently stipulate in advance to submit their
> controversies for resolution within a particular jurisdiction.   *See National
> Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311 (1964).   Where such
> forum-selection provisions have been obtained through "freely
> negotiated" agreements and are not "unreasonable and unjust,"   [*M/S*]
> *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), their enforcement
> does not offend due process.

*Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985).[40]

---

[40] This court may look to either the law of the State of Alabama or federal law to determine
the validity of a forum selection clause.   This suit is before the court on diversity and federal
question jurisdiction.   In *Smith v. Professional Claims, Inc.*, 19 F. Supp. 2d 1276 (M.D. Ala. 1998),
the court explained the following:

> It is not clear whether federal or state law governs the validity of forum
> selection clauses in federal diversity actions.   *See, e.g., Amermed Corp. v. Disetronic
> Holding AG*, 6 F.Supp.2d 1371, 1373 (N.D.Ga.1998) ("Federal courts are split as to
> whether state or federal law should govern enforcement of a forum selection clause
> when a federal court is sitting in diversity. Scholars are similarly adrift.").   This court
> does not have to resolve that issue because the standard is now the same under
> Alabama and federal law.

> Under the federal approach, forum selection clauses are "prima facie valid
> and should be enforced unless enforcement is shown by the resisting party to be
> unreasonable under the circumstances."   *M/S Bremen v. Zapata Off-Shore Co.*, 407
> U.S. 1, 10 . . . (1972).   The Alabama Supreme Court recently adopted the federal
> approach set forth in *Bremen. See Professional Ins. Corp. v. Sutherland*, 700 So.2d
> 347, 350 (Ala.1997) ( "[W]e now adopt the majority rule that a forum selection
> clause should be enforced so long as enforcing it is neither unfair nor unreasonable
> under the circumstances.").

> Borrowing language from *Bremen*, the Alabama Supreme Court held that a
> plaintiff contesting enforcement of a forum selection clause has "the burden of

Indigo Creek does not argue that the Forum Selection Clause is unreasonable or unjust under the circumstances, nor does it dispute that the terms of the settlement agreement were freely negotiated.  Indigo Creek thus fails to rely on any of the grounds upon which a forum selection clause may be deemed unenforceable.  Instead, it contends the Forum Selection Clause is "void" under general principles of contract law.

In the law of contracts, consideration may generally be defined as a performance or a return promise that is bargained for by one party.  *See Restatement (Second) of Contracts* § 71 (1981).  It is a well-settled rule that consideration is an essential element of contract formation.  *See, e.g., id.* §§ 71-92.  Here, Indigo Creek recognizes that the settlement agreement was supported by valid consideration when it was executed:  *i.e.*, plaintiff agreed to release defendant from liability in this suit, in return for (among other things) defendant's consent to the terms of the Forum Selection Clause.[41]  Even so, defendant contends that plaintiff has "abandoned" his

---

showing either (1) that enforcement of the forum selection clause would be unfair on the basis that the contracts in this case were affected by fraud, undue influence, or overweening bargaining power or (2) that enforcement would be unreasonable on the basis that the chosen ... forum would be seriously inconvenient for the trial of the action." *Id.* at 352.

*Id.* at 1280.

[41] According to Indigo Creek, "[t]he forum selection clause obviously had importance to the plaintiff since clearly this case presents substantial question as to the jurisdiction of the Alabama courts against the defendants other than McClellan[d], Blackburn and Indigo Creek.  The agreement not to seek judgment against the individual defendants by the plaintiff was certainly valid

obligations under the settlement agreement, and therefore, "the forum selection clause is now void for lack of adequate consideration."[42]  This court disagrees.

Construing defendant's argument in the light most favorable to that defendant, Indigo Creek is arguing that plaintiff *breached* the July 19, 2004 settlement agreement by reasserting his claims against Indigo Creek and other defendants and, therefore, the agreement (including the Forum Selection Clause) should not be enforced.  The appropriate remedies for breach of contract, however, include damages, specific performance, and injunction.  *See, e.g., Restatement (Second) of Contracts* § 346 (1981) (stating that "[t]he injured party has a right to damages for any breach by a party against whom the contract is enforceable"); *id.* § 357 (stating that, subject to exceptions, "specific performance of a contract duty will be granted in the discretion of the court against a party who has committed or is threatening to commit a breach of the duty"); *id.* (stating that, subject to exceptions and conditions, "an injunction against breach of a contract duty will be granted in the discretion of the court against a party who has committed or is threatening to commit a breach of the duty"). *Voiding* a contract is not an appropriate remedy here.

---

consideration for the forum selection clause" (doc. no. 21 (Response) at 4-5).

Defendants Indigo Creek and Jeremy Blackburn promised, in addition to agreeing to the Forum Selection Clause, to "pay to the plaintiff the sum of $1,000,000.00 and interest at the rate of 8%" (*id.* at 2).

[42] Doc. no. 21 (Response) at 6.

Indigo Creek also argues that plaintiff should not be permitted to "pick and choose those provisions of the settlement agreement advantageous to him and disregard the remaining provisions."[43]  This court agrees.  Certainly, Indigo Creek may seek *appropriate* remedies if plaintiff breached enforceable provisions of the settlement agreement.

Courts have frequently enforced the terms of a forum selection clause where the terms of the agreement were freely negotiated and are neither unreasonable nor unjust. *See, e.g., Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991); *P&S Business Machines, Inc. v. Canon USA, Inc.*, 331 F.3d 804 (11th Cir. 2003); *Smith v. Professional Claims, Inc.*, 19 F. Supp. 2d 1276 (M.D. Ala. 1998).  The court therefore finds it may alternatively exercise personal jurisdiction over defendant Indigo Creek pursuant to the Forum Selection Clause in the July 19, 2004 settlement agreement.

**2.     Board of Directors**

    **a.     Jeremy Blackburn**

Jeremy Blackburn is one of the five members of Indigo Creek's Board of Directors.  He visited plaintiff in Cullman, Alabama on April 2, 2003, to solicit

---

[43] *Id.*

plaintiff's investment in Indigo Creek.  Blackburn also transmitted two e-mails to plaintiff in Alabama on April 23, and a third e-mail on April 25, 2003.  In all three communications, Blackburn urged, advised, and negotiated plaintiff's purchase of Indigo Creek stock.  Blackburn sent two more e-mails to plaintiff in Alabama on May 9 and May 23, 2003, after plaintiff purchased shares in Indigo Creek.  In these e-mails, Blackburn told plaintiff that the company was successfully wooing clients in Utah and on the East Coast.  Finally, Blackburn offered to enter into the Put Agreement with plaintiff, by the terms of which Blackburn (along with three other defendants) agreed to purchase plaintiff's preferred shares in Indigo Creek, if plaintiff became dissatisfied with his investment.

The court finds that Jeremy Blackburn had "minimum contacts" with the State of Alabama, and that it does not offend "traditional notions of fair play and substantial justice" to exercise jurisdiction over him.  Even so, Jeremy Blackburn also agreed to the terms of the Forum Selection Clause in the July 19, 2004 settlement agreement, and the court also may exercise jurisdiction over him on that basis, for the reasons explained above.

### b.   Gregory McClelland

Gregory McClelland telephoned plaintiff in Alabama sometime during the spring of 2003, and arranged a personal meeting.  McClelland traveled to Cullman,

Alabama on April 2, 2003, where he and Jeremy Blackburn gave plaintiff a copy of the Private Placement Memorandum, offered to sell twenty shares of preferred stock in Indigo Creek for a sum of one million dollars, and explained that this money would be used to further the corporation's business plan.  Four weeks later, McClelland helped consummate plaintiff's purchase of Indigo Creek stock by offering and agreeing to the terms of the Put Agreement.  That contract assured plaintiff that he could sell his stock to McClelland (and three other defendants) if he became dissatisfied with his investment.

Gregory McClelland did *not* agree to the terms of the Forum Selection Clause in the July 19, 2004 settlement agreement.  The court, therefore, must apply traditional notions of due process to determine whether it may exercise jurisdiction over this defendant.

### i.    "Minimum Contacts"

Due Process requires that Gregory McClelland have "minimum contacts" with the State of Alabama.

To constitute minimum contacts for purposes of specific jurisdiction,[44] the defendant's contacts with the applicable forum must satisfy three criteria.  First, the contacts must be related to the plaintiff's

---

[44] Plaintiff argues that the court may exercise *specific* personal-jurisdiction over defendants. "Specific" jurisdiction arises only from contacts related to the cause of action.  In contrast, "general" jurisdiction arises from frequent contacts that are unrelated to the litigation.  *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 9 (1984).

cause of action or have given rise to it.  Second, the contacts must involve some act by which the defendant purposefully avails [himself] of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws.  Third, the defendant's contacts with the forum must be such that [the defendant] should reasonably anticipate being haled into court there.

*SEC v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997) (footnote omitted) (citing *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir. 1993)).

Here, the first requirement clearly is satisfied.  McClelland's telephone call, his visit to Alabama, and his offer to enter into the Put Agreement, were all related to his inducement of plaintiff's investment in Indigo Creek, which is the basis of this action.

With regard to the second requirement, whether McClelland purposefully availed himself of the benefits and protections of the laws of the State of Alabama, "'[c]onsiderations such as the quality, nature, and extent of the activity in the forum, the foreseeability of consequences within the forum from activities outside it . . . relate to whether it can be said that the defendant's actions constitute 'purposeful availment'"' *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir. 1986) (quoting *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1268 (5th Cir. 1981)).  "This requirement assures that a defendant will not be haled into a jurisdiction as a result of random, fortuitous, or attenuated contacts."  *Robinson v. Giarmarco & Bill,* 74 F.3d 253, 258 (11th Cir. 1996) (citing *Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 475 (1985) and *Keeton v. Hustler Magazine, Inc.*, 465

U.S. 770, 774 (1984)).

The existence of a contract between a foreign defendant and a resident of the forum state does not automatically amount to "purposeful availment." *See Burger King*, 471 U.S. at 478.  Even so, the requirement may be satisfied when a non-resident defendant solicits the business of a forum resident, and a "continuing relationship . . . [is] contemplated." *Sea Lift*, 792 F.2d at 994 (citing *Southwest Offset, Inc., v. Hudco Public Company*, 622 F.2d 149, 152 (5th Cir. 1980); *Standard Fittings Company v. Sapag, S.A.*, 625 F.2d 630, 642 n.23, 643-44 (5th Cir. 1980)).  *See also Carrillo*, 115 F.3d at 1546 (sending solicitations to "previously established" and "existing" investors was evidence that non-resident defendant contemplated a "continuing relationship" with forum residents).

Here, McClelland offered to sell plaintiff twenty shares of preferred stock in Indigo Creek for a sum of one million dollars.  The Private Placement Memorandum promised that holders of preferred shares would receive periodic dividends issued by members of the Board of Directors and, given certain conditions, would be allowed to vote for members of the Board of Directors at an annual meeting of shareholders.[45] One of Jeremy Blackburn's e-mails suggested that he, McClelland, and the other members of the Board of Directors were not willing "to become partners with

---

[45] Doc. no. 20 (Modi Affidavit), Ex. 10 at 19-20.

21

someone we don't like on a personal level.  We feel we can have a successful business relationship with you."[46]  Certainly, therefore, it is reasonable to infer that McClelland contemplated a continuing relationship with plaintiff when he visited him in Cullman, Alabama.

McClelland also offered to enter into the Put Agreement with plaintiff on April 30, 2003, "in contemplation of [plaintiff's] purchase of twenty (20) shares of preferred stock in Indigo Creek."[47]  The Put Agreement included a choice of law provision which stipulated that "[t]his Agreement shall be governed by the laws of Alabama."[48] Although a choice of law provision standing alone is insufficient to confer jurisdiction, it may reinforce the non-resident defendant's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."  *Burger King*, 471 U.S. at 482; *see also Sea Lift*, 792 F.2d at 994 (choice of law provision is "indication" of whether non-resident defendant purposefully availed itself of the laws of forum state).  The court therefore concludes that Gregory McClelland purposefully availed himself of the benefits and protections of the laws of the State of Alabama.

The third requirement of the minimum contacts test examines whether McClelland's contacts with the State of Alabama were such that he reasonably should

---

[46] *Id.*, Ex. 4.

[47] *Id.*, Ex. 2.

[48] *Id.*

have anticipated being haled into court in this state.  "The Supreme Court has previously held that defendants whose 'intentional . . . actions were expressly aimed [at the forum state]' could reasonably anticipate being haled into court there." *Carrillo*, 115 F.3d at 1546-1547 (quoting *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)).  Here, McClelland deliberately targeted a resident of the State of Alabama to solicit a significant investment.  He reasonably should have anticipated being haled into court in Alabama when he was "fully aware that [his] actions or omissions would have a substantial effect in [this state]."  *Robinson*, 74 F.3d at 259.  The court ultimately concludes, therefore, that all requirements of the minimum contacts test are satisfied, and that plaintiff has met the first part of the due process analysis.

### ii.    Fair play and substantial justice

"Having found that there were sufficient minimum contacts, the question that remains is whether this is 'one of those *rare* cases in which minimum requirements inherent in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction."  *SEC v. Carrillo*, 115 F.3d 1540, 1547 (11th Cir. 1997) (emphasis supplied) (quoting *Asahi Metal Industry Company v. Superior Court of California*, 480 U.S. 102, 116 (1987) (Brennan, J., concurring)).  The court must examine three factors to make this determination:  the burden on the defendant in defending the lawsuit in the forum state; the interest of the forum state in adjudicating

the dispute; and the plaintiff's interest in obtaining convenient and effective relief. *See, e.g., Carillo*, 115 F.3d at 1547.

While McClelland is a resident of the State of South Carolina, "modern methods of transportation and communication have significantly ameliorated [the additional] burden" of defending this suit in Alabama. *Sculptchair, Inc. v. Century Arts, LTD*, 94 F.3d 623, 632 (11th Cir. 1996) (citing *McGee v. International Life Insurance Company*, 355 U.S. 220, 223 (1957)).  The State of Alabama has a significant interest in stamping out the type of fraud alleged in plaintiff's complaint, and plaintiff also has a significant interest in obtaining convenient and effective relief. On balance, these consideration do not defeat this court's conclusion that it may exercise jurisdiction over defendant Gregory McClelland, and the motion to dismiss also will be denied as to him.

### c.    Lloyd Hall

Defendant Lloyd Hall made one telephone call to plaintiff in Alabama.  Hall asked plaintiff whether he might be interested in "currency trading."  Hall does not have sufficient "minimum contacts" with the State of Alabama to satisfy the first prong of the due process analysis.

Even so, Hall agreed to the terms of the Forum Selection Clause in the July 19, 2004 settlement agreement.  The court may therefore exercise jurisdiction over Hall

for the reasons explained in Part II(A)(1)(a) of this opinion, *supra*.

### d.    Harry Brossman and Mark Fried

Defendants Harry Brossman and Mark Fried had no direct contacts with the State of Alabama, let alone "minimum contacts." Regardless, both agreed to the terms of the Forum Selection Clause in the July 19, 2004 settlement agreement. The court therefore may exercise personal jurisdiction over both defendants for the reasons explained above.

### 3.    The Shareholders

The four, limited-liability-company defendants — Stewarts Way LLC, Brossman & Associates LLC, JJ Hall LLC, and RNM LLC — constitute all of the shareholders of common stock in Indigo Creek. They all agreed to the terms of the Forum Selection Clause in the July 19, 2004 settlement agreement and therefore, the court may exercise personal jurisdiction over these defendants for the reasons explained above.

### 4.    Mayako Blackburn

Defendant Mayako Blackburn, the wife of Jeremy Blackburn, agreed to the terms of the Forum Selection Clause in the July 19, 2004 settlement agreement. The court therefore may exercise personal jurisdiction over her for the reasons explained above.

5.     **Jean Rene McClelland**

Defendant Jean Rene McClelland, the wife of Gregory McClelland, did *not* agree to the terms of the Forum Selection Clause in the July 19, 2004 settlement agreement.  The court, therefore, must apply traditional notions of due process to determine whether it may exercise jurisdiction over this defendant.

Plaintiff claims that Jean Rene McClelland offered and executed the terms of the Put Agreement "as a further part of the scheme and coordinated plan of Defendants."[49]  The Put Agreement gave plaintiff an option to sell his shares in Indigo Creek to McClelland (and three other defendants), if plaintiff were dissatisfied with his investment.  Plaintiff explained that:

> In conjunction with my consideration of whether to enter into this Put Agreement and to invest in [Indigo Creek], Defendants Jeremy Blackburn, Mayako Blackburn, Gregory D. McClelland and Jean Rene McClelland provided financial statements in order to verify that they would have the assets and monetary liquidity required to repurchase the stock and pay the agreed price if and when the Put Agreement was executed . . . . The personal financial statement of Gregory McClelland and Jean Rene McClelland represented that they had a net worth as of April 21, 2003, of . . . $2,904,142.00.[50]

Jean Rene McClelland also mailed or transmitted copies of the Put Agreement and her financial statements to plaintiff's residence or place of business in Alabama.[51]

---

[49] Doc. no. 20 (Modi Affidavit), ¶ 21.

[50] *Id.*, ¶ 11.

[51] Plaintiff claims that he "received numerous communications from the Defendants initiated outside of the State of Alabama to me at my office, residence or cell phone in Alabama through

As a threshold matter, the court notes that even "a single act can be sufficient to satisfy the minimum contacts test, even an act that occurs outside the forum.  Such an act must bear a significant relationship to the cause of action."  *Delong Equipment Company v. Washington Mills Abrasive Company*, 840 F.2d 843, 851 n.10 (11th Cir. 1988).  *See also In re S1 Corporation Securities Litigation*, 173 F. Supp. 2d 1334, 1345 (N.D. Ga. 2001) ("[E]ven a single purposeful contact may be sufficient to meet the minimum contacts standard when the underlying proceeding is directly related to that contact.").  At the heart of plaintiff's complaint is his allegation that defendants, including Jean Rene McClelland, fraudulently induced him to invest one million dollars in Indigo Creek.  Plaintiff also claims that Jean Rene McClelland (and three other defendants) breached the terms of the Put Agreement when he sought to recover his investment.  The court concludes that Jean Rene McClelland's offer and execution of the terms of the Put Agreement were directly related to the underlying proceeding and, therefore, her contacts with the State of Alabama *may* satisfy the requirements of due process.

### i.        "Minimum contacts"

As previously discussed, the minimum contacts test entails three elements:  (1)

---

various means including mail, facsimile, telephone and email directly related to the claims asserted in my Complaint."  Doc. no. 20 (Modi Affidavit), ¶ 5.  Plaintiff also "executed all of the agreements between myself and the Defendants upon which claims in this case are based while I was physically in the Northern District of Alabama."  *Id.*, ¶ 7.

whether the defendant's contacts with the forum state were related to plaintiff's cause of action; (2) whether the non-resident defendant "purposeful availed" herself of the laws of the forum state; and (3) whether defendant's contacts with the forum state were such that she reasonably should have anticipated being haled into court there.

The first and third requirements are easily satisfied. Jean Rene McClelland's actions were directly related to plaintiff's fraud and breach of contract claims. Furthermore, "[t]he Supreme Court has previously held that defendants whose 'intentional . . . actions were expressly aimed [at the forum state]' could reasonably anticipate being haled into court there." *SEC v. Carrillo*, 115 F.3d 1540, 1546-1547 (11th Cir. 1997) (quoting *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)).

The closer question is whether Jean Rene McClelland purposefully availed herself of the laws of the State of Alabama. One commentator has noted that:

> In developing the concept of "purposeful availment," the [Supreme] Court has recognized that personal jurisdiction cases fall into three broad categories with regard to subject matter — family law, and the two most prolific categories, contracts and torts. Although purposeful availment is required in all types of cases, it seems to take on different meanings depending on the basis of the underlying claim — specifically, whether the underlying claim is based in contract or in tort . . . . Thus, conduct that amounts to purposeful contact with a forum in one context may fall short in another.

Summer Bennett Joseph, *Drowning Professionals in the Stream of Commerce:  An Examination of Purposeful Availment in the Professional Liability Context*, 53 Emory

28

L.J. 277, 284 (2004).  Of course, plaintiff's claims against Jean Rene McClelland rely on theories of tort *and* contract law.[52]

With regard to the latter, the mere fact that Jean Rene McClelland entered into the Put Agreement with plaintiff does not establish "purposeful availment."  *See, e.g., Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.") (emphasis in original).  Instead, the court must examine the prior negotiations between the parties, the contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.  *Id.* at 479.

Here, there is no evidence that Jean Rene McClelland engaged in extensive negotiations with plaintiff prior to the execution of the Put Agreement.  Plaintiff negotiated with Jeremy Blackburn and this defendant's husband, *Gregory* McClelland, but his communications with Jean Rene McClelland were minimal.  Jean Rene McClelland also did not contemplate that she would be in "continuing and wide-reaching contacts" with plaintiff in the State of Alabama.  *Id.* at 480.  The Put

---

[52] *See* doc. no. 1 (Complaint).  Count Eight alleges that Jean Rene McClelland breached the terms of the Put Agreement.  Count Fourteen alleges that McClelland conspired with the other defendants to "fraudulently procure" plaintiff's assets.  Counts One and Nine also allege that McClelland and other defendants committed fraud under Alabama and Nevada law, respectively.

Agreement permitted plaintiff to make a *one-time* sale of stock to her (and three other defendants) if he were dissatisfied with his investment in Indigo Creek.  The Put Agreement also included a choice of law provision, which specified that the parties would rely on the laws of the State of Alabama to litigate any disputes regarding contract enforcement.  This alone is insufficient to confer jurisdiction over Jean Rene McClelland.  *See id.* at 482 (choice of law provision may reinforce defendant's deliberate affiliation with the forum state, but "standing alone [it] would be insufficient to confer jurisdiction").

The remaining question is whether the criteria of "purposeful availment" may be satisfied in the context of plaintiff's tort claims.  This court could not locate any Supreme Court or Eleventh Circuit precedent construing the meaning of "purposeful availment' in the context of a fraud claim.  The Fifth and Sixth Circuit Courts of Appeals, however, have adopted the same standard:  "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *See, e.g., Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) (applying standard to plaintiff's claims of fraud and fraudulent inducement); *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) (applying standard to plaintiff's fraud claim).  In *Wien Air Alaska*, a non-resident defendant's contacts with the State of Texas were letters, faxes, and telephone calls "whose

contents contained fraudulent misrepresentations and promises and whose contents failed to disclose material information." 195 F.3d at 212. In *Neal*, a non-resident defendant's contacts with the State of Tennessee were telephone calls and faxes in which defendant misrepresented a third party's offer for the purchase of goods. 270 F.3d at 330. The Fifth and Sixth Circuits held, respectively, that the non-resident defendants had purposefully availed themselves of the laws of the forum states.

Here, it is reasonable to infer that Jean Rene McClelland stood to benefit from plaintiff's investment in Indigo Creek. She was willing to risk the possibility that plaintiff would exercise his option to sell his shares, and leave her (and three other defendants) on the hook for one million dollars. McClelland also entered into the Put Agreement just before plaintiff agreed to purchase Indigo Creek's stock. McClelland therefore reached beyond the state of South Carolina into Alabama and placed before plaintiff the final carrot necessary to secure his investment.

Of course, if plaintiff's claims are true, McClelland never intended to adhere to the terms of the Put Agreement. She intended to retain plaintiff's investment, regardless of whether he elected to exercise his put option. If plaintiff's claims are true, therefore, the terms of the Put Agreement were nothing more than false promises. "These false representations are the heart of the lawsuit [against McClelland] — they were not merely incidental communications sent by the defendant into [Alabama]."

*Neal*, 270 F.3d at 332.  The court concludes that the criteria of "purposeful availment" is satisfied, and that Jean Rene McClelland had minimum contacts with the State of Alabama.

### ii.      Fair play and substantial justice

Having concluded that there were sufficient minimum contacts, the question that remains, as previously discussed, is "whether this is 'one of those *rare* cases in which minimum requirements inherent in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction." *SEC v. Carrillo*, 115 F.3d 1540, 1547 (11th Cir. 1997) (emphasis supplied) (quoting *Asahi Metal Industry Company v. Superior Court of California*, 480 U.S. 102, 116 (1987) (Brennan, J., concurring)).

This court's previous discussion of this issue applies fully here.   While McClelland is a resident of the State of South Carolina, "modern methods of transportation and communication have significantly ameliorated [the additional] burden" of defending this suit in Alabama. *Sculptchair, Inc. v. Century Arts, LTD*, 94 F.3d 623, 632 (11th Cir. 1996) (citing *McGee v. International Life Insurance Company*, 355 U.S. 220, 223 (1957)).  The State of Alabama has a great interest in stamping out the type of fraud alleged in plaintiff's complaint, and plaintiff also has a significant interest in obtaining convenient and effective relief.  On balance, these consideration do not defeat this court's conclusion that it may exercise personal

32

jurisdiction over defendant Jean Rene McClelland.

**B.     Motion to Transfer Venue**

Defendant Indigo Creek moves, in the alternative, to transfer this action to the United States District Court for the District of South Carolina.  The statute upon which defendant relies, 28 U.S.C. § 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  This provision "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Organization, Inc. v. Ricoh Corporation*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).  "The federal courts traditionally have accorded a plaintiff's choice of forum considerable deference."  *In re Ricoh Corporation*, 870 F.2d 570, 573 (11th Cir. 1989) (citations omitted).  "Thus, in the usual motion for transfer of section 1404(a), the burden is on the movant to establish that the suggested forum is more convenient."  *Id.* Furthermore, "the Supreme Court stated that when weighing whether transfer is justified under section 1404(a), a choice of forum clause is 'a *significant* factor that figures *centrally* in the District Court's calculus.'" *Id.* (emphasis in original) (quoting *Stewart Organization*, 487 U.S. at 29).

33

Here, plaintiff has chosen the Northern District of Alabama as his choice of forum. Plaintiff claims he will incur substantial costs if he is required to pursue his claims in South Carolina. He also states that there are at least four Alabama residents who may serve as his witnesses at trial. According to plaintiff, he does "not control these witnesses and may not be able to get them to agree to voluntarily appear for the trial. If they agree to do so, the cost will be significant."[53]

Defendant Indigo Creek argues that transfer to South Carolina is warranted because its corporate headquarters is located in that state, defendants Hall, Blackburn, and McClelland reside in that state, and South Carolina is "much more convenient and accessible to [] defendants Fried and Brossman," who reside in the states of Pennsylvania and New Jersey, respectively.[54]

Defendant's argument is unpersuasive. Defendant and its Board of Directors will undoubtedly incur additional costs if they are required to defend this suit in Alabama. Even so, transferring this case to South Carolina will only shift those same burdens to plaintiff and his witnesses. The court must defer to plaintiff's choice of forum where, as here, defendant fails to establish that its suggested forum is more convenient. Further, the fact that Indigo Creek consented to the jurisdiction of this court in the July 19, 2004 settlement agreement is another significant consideration

---

[53] Doc. no. 20 (Modi Affidavit), ¶ 42 at 16.
[54] Doc. no. 17 (Brief) at 11.

34

in plaintiff's favor.  The court concludes that defendant Indigo Creek's motion to transfer this case to the District of South Carolina is due to be denied.

## III. CONCLUSION

In accordance with the foregoing, the motions by fewer than all defendants to dismiss plaintiff's claims for lack of personal jurisdiction are due to be denied. Defendant Indigo Creek's motion to transfer this action to the District of South Carolina also is due to be denied.  An appropriate order will be entered contemporaneously herewith.

DONE this 10th day of March, 2005.

_____
United States District Judge